UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORY WOOLLARD,

               Plaintiff

v.

CORIZON HEALTH, INC.,
RICKEY COLEMAN, and
ROSILYN JINDAL,

               Defendants.

Case No. 2:18-cv-11529
District Judge Paul D. Borman
Magistrate Judge Anthony P. Patti

_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART and DENY IN PART DEFENDANTS JINDAL, COLEMAN AND CORIZON HEALTH'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 (ECF NO. 71)

I.   **RECOMMENDATION:**  The Court should **GRANT IN PART and DENY IN PART** Defendants Jindal, Coleman and Corizon Health's motion for summary judgment pursuant to Fed. R. Civ. P. 56 (ECF No. 71).

II.   **REPORT:**

A.   **Background**

Cory Lee Woollard is currently incarcerated at the Michigan Department of Corrections (MDOC) Gus Harrison Correctional Facility (ARF).[1]  He initiated the instant lawsuit on May 15, 2018 against seven Defendants.  (ECF 1 at 1.)  On

_____

[1] (*See* ECF No. 48 and www.michigan.gov/corrections, "Offender Search.")

September 17, 2018, Plaintiff filed an amended verified complaint (FAC), which names three Defendants:  (1) Corizon Health, Inc.; (2) Richard Harbaugh, purportedly an MDOC Assistant Chief Medical Officer (ACMO); and, (3) Rosilyn Jindal, a Physician Assistant.  (ECF No. 28 ¶¶ 9-11.)  Similar to his original complaint, the underlying facts span the period from 2016, when he was incarcerated at Macomb Correctional Facility (MRF), through November 2017, at which point he was housed at ARF.  (ECF No. 28, ¶¶ 12-22.)  Plaintiff's two causes of action are based upon the Eighth Amendment.  (ECF No. 28, ¶¶ 23-33.)  As with his original complaint, Plaintiff seeks injunctive and monetary relief, as well as an award of costs and attorney fees.  (ECF No. 28, PageID.203.)

For reasons set forth in prior Court filings, the FAC remains the operative pleading and Assistant Chief Medical Officer (ACMO) Rickey Coleman has been substituted for Harbaugh in the FAC.  (*See* ECF Nos. 53, 60, 61 & 62.)  Accordingly, the only remaining, active Defendants are Corizon Health, Coleman, and Jindal.

### B.    Instant Motion

Currently before the Court is Defendants Jindal, Coleman and Corizon Health's motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (ECF No. 71.)  The Court issued a scheduling order, which required Plaintiff to file a response on or before August 20, 2020.  (ECF No. 73, PageID.723.)  Plaintiff

timely filed his response on August 10, 2020.  (ECF No. 74.)  Accordingly,

Defendants' reply was due on or about August 24, 2020.  E.D. Mich. LR

7.1(e)(2)(C) ("a reply brief supporting a nondispositive motion must be filed

within 7 days after service of the response, but not less than 3 days before oral

argument.").  Defendants did not file their reply until September 3, 2020.  (ECF

No. 75.)  It is  tardy and, therefore, has not been considered in this report and

recommendation.

### C.    Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is material if it might affect the outcome of the case under governing

law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court

"views the evidence, all facts, and any inferences that may be drawn from the facts

in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt.

Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of

material fact exists . . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486

(6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56 (e)(2)

(providing that if a party "fails to properly address another party's assertion of

3

fact," then the court may "consider the fact undisputed for the purposes of the motion."). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).

Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994). In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

4

The fact that Plaintiff is *pro se* does not lessen his obligations under Rule 56. Rather, "liberal treatment of pro se pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006). In addition, "[o]nce a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz* [*v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a pro se litigant does not alter [this] duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against a pro se plaintiff because he "failed to present any evidence to defeat the government's motion").

### D. Discussion

#### 1. Medical details and special accommodation notices

MDOC policy instructs that "[p]risoners . . . shall be provided with assistive devices and other services necessary for medical needs, subject to restrictions necessary to maintain institutional order and security." MDOC PD 04.06.160

("Medical Details and Special Accommodation Notices"), effective June 30, 2008. (ECF No. 74, PageID.742.)  "Whenever a prisoner is identified as having a medical condition which restricts his/her ability to function adequately in the institutional environment, a qualified health professional shall identify reasonable options available in a corrections setting which will meet the prisoner's special medical need."  (*Id.*, ¶ E.)  "Review of the continued need for a Medical Detail or Special Accommodation Notice shall be conducted during the annual health care screening . . . [,]" (*id.*, ¶ F), which Plaintiff claims takes place around the prisoner's birthday (ECF No. 28, ¶ 20).  This same policy instructs that cancellation of a *currently valid* Medical Detail or Special Accommodation Notice requires "approval from an appropriate medical practitioner after *examination* of the prisoner."  (ECF No. 74, PageID.743 ¶ K (emphasis added).)

Plaintiff is a paraplegic.  (ECF No. 28, PageID.199 ¶ 12; ECF No. 71, PageID.563 ¶ 6.)  He is currently serving a sentence imposed on September 24, 2009 in state court.  Case No. 09-025155-FC-H (Genesee County).  As early as March 31, 2014, Plaintiff's special accommodations orders included a single-person room, an air mattress, a monthly bottle of foam soap, and a Transcutaneous Electrical Nerve Stimulation (TENS) unit.  (ECF No. 72, PageID.625, 654; ECF No. 74, PageID.745.)  In Plaintiff's opinion, "[t]he absence of a 'Stop Date' for

6

any of these accommodations indicates that they were intended to be permanent."
(ECF No. 74, PageID.730.)

### a.    June 2017 – August 2017 (MRF)

Although the events in question concern ARF, Plaintiff's experience at MRF provides helpful context for the matter currently before the Court.  In June 2017, Plaintiff received a bottle of foam soap and exchanged his old air mattress – presumably the model described as "suitable" for pressure ulcer treatment – for a new one – presumably one "not designed or intended to prevent the onset of bedsores[.]"  (ECF No. 72, PageID.605, 608; ECF No. 28, ¶¶ 14-16.)  On June 26, 2017, Plaintiff sought replacement of his specialized air mattress, but the June 28, 2017 response explained:  "Sir, you have no approval for any thing [sic] other than the standard state issue air mattress.  If you require something more, please discuss with your provider and have him/her obtain the necessary approvals from ACMO."  (ECF No. 72, PageID.609.)

On July 13, 2017, Plaintiff received, among other supplies, three sets of TENS unit pads and a bottle of foam soap.  (*Id*., PageID.610.)  On or about August 7, 2017, Plaintiff kited health care regarding a bedsore on his right buttock.  (*Id*., PageID.612.)  Plaintiff was seen on August 10, 2017, at which point a nurse cleansed the area and applied a dressing.  (*Id*., PageID.613, 619-622.)

### b.    August 2017 – May 2018 (ARF)

Although Plaintiff describes a different date, it seems that he was transferred from MRF to ARF on or about August 25, 2017.  (*Compare id.*, PageID.623-624, *with* ECF No. 1, PageID.200 ¶ 18.)  At that time, Plaintiff had twenty-seven special accommodations orders, including orders for a single-person room, an air mattress, a monthly bottle of foam soap, and a TENS unit.  (*Id.*, PageID.625; ECF No. 74, PageID.745.)  On August 28, 2017, a nurse ordered wound care for the right buttock, and – in what appears to be Jindal's first, relevant involvement with Plaintiff – Jindal noted that Plaintiff's single-cell special accommodation "appears to be medically necessary at this time."  (*Id.*, PageID.627-628.)  However, according to Plaintiff, Jindal told him that she "was going to cancel several of his Special Accommodations Notices."  (ECF No. 74, PageID.731; *see also id.*, PageID.732, 738 ¶ 1.)

On September 1, 2017, Plaintiff was given an air mattress, as his current one had a hole.  (ECF No. 72, PageID.629.)  On September 3, 2017, Plaintiff saw a nurse and kited health care about supplies, wherein he seems to have stated, "please leave me alone and do not call me out to alter my accommodations."  (*Id.*, PageID.630-632.)  According to Plaintiff, he sent this kite out of concern that his Special Accommodation Orders would be cancelled.  (ECF No. 74, PageID.738 ¶ 2 [Plaintiff's Decl.].)  At his September 6, 2017 nurse's visit, he received 10 pairs of large exam gloves and 10 blue pads.  (ECF No. 72, PageID.633.)

On September 12, 2017, Plaintiff kited health care regarding supplies, namely a blue pad, gloves, pullups, and Aloe Vesta perineal foam soap. (*Id.*, PageID.637.) At the September 14, 2017 nurse's visit, Plaintiff received gloves and blue pads, but he was informed that the foam pump soap was not in yet but would be dispensed upon arrival. (*Id.*, PageID.638.) His September 18, 2017 MDOC Health Assessment reflects that, "Attempted to patch air mattress. Will be given new one when available." (*Id.*, PageID.640.)

On September 27, 2017, Plaintiff sought foam soap, blue pads, gloves and Attends® briefs. (*Id.*, PageID.641.) However, at the September 28, 2017 nurse's visit, he was given bar soap instead of foam soap, and the nurse's notes explain that "[n]o foam soap was ordered, [due to] no RMO [(Regional Medical Officer)] approval." (*Id.*, PageID.642-643.) At his October 5, 2017 nurse's visit, Plaintiff received blue pads, gloves, bio-hazard bags, and "one soap in lab cup." (*Id.*, PageID.644.) On October 10, 2017, Plaintiff sought a patch kit for his air mattress, apparently stating he would file an "ADA complaint and grievance soon . . . [,]" and did not "want bed sores." (*Id.*, PageID.645.) It seems he also sought a new air mattress, and he was given an air mattress by the Health Unit Manager (HUM) on October 11, 2017. (*Id.*, PageID.646-647.)

The November 2017 interaction was plentiful. On November 3, 2017, Plaintiff received blue pads, gloves, and "cleansing soap in a bottle with pump

9

removed." (*Id.*, PageID.648.) At the time of his November 15, 2017 chronic care visit with Jindal, Plaintiff had twenty-four special accommodations orders. (*Id.*, PageID.649-652, 654.) It appears that Jindal initiated ACMO Review as to eleven medical details/special accommodations. (*Id.*, PageID.653.) ACMO Coleman sought more information as to some of the requests; ultimately, five were deferred (foam soap holder, mirror, side-rolling table, single-person room, and TENS unit and supplies). (*Id.*, PageID.655-658.) The orders for a single-person room and TENS unit were "deferred," as, "[p]er MDOC guidelines, he does not qualify for a single-person room. He is to have a wheelchair accessible room which negates the need for a single-person room. And the MDOC does not allow TENS units any longer. That needs to be retrieved from the patient today." (*Id.*, PageID.656.) No explanation was given for deferral of the foam soap holder. (*Id.*, PageID.657-658.)

Accordingly, by November 16, 2017, Plaintiff only had eighteen special accommodation orders; while the air mattress order remained in place, the orders for a single-person room, a TENS unit, and foam soap were among those removed. (ECF No. 74, PageID.746). On November 18, 2017, Plaintiff informed health care that he had just discovered a bedsore at the base of his tailbone. (ECF No. 72, PageID.659.) Notes from the November 21, 2017 nurse's visit indicate "[p]otential or actual infection" on the lower right buttock. (*Id.*, PageID.660.) Wound care was performed, he brought his air mattress for repair/replacement, but

10

the mattress material stress fractured and was not repairable.  The mattress was replaced.  (*Id*., PageID.662.)  Plaintiff's tailbone was treated and/or examined on November 22nd, 23rd, 24th, and 25th.  (*Id*., PageID.664-671.)  On November 25, 2017, Plaintiff was prescribed antibiotics.  (*Id*., PageID.672.)

On November 27, 2017, it seems that Jindal saw Plaintiff for a lesion on his left calf.  (*Id*., PageID.673-674.)  On November 28th, 29th, 30th, and December 1st, Plaintiff presented for monitoring of his wound and/or left leg cellulitis, although in at least one case he denied wound care.  (*Id*., PageID.675-682.)  Plaintiff allegedly refused to go to Health Care for wound care on December 5, 2017; according to a unit officer, Plaintiff stated that he did not need a dressing change. (*Id*., PageID.683.)  When Plaintiff sought supplies from Health Care on December 7, 2017, he allegedly informed the nurse that his buttock dressing was good and did not need to be changed.  (*Id*., PageID.684.)  During his December 14, 2017 nurse's visit, he received various supplies and, allegedly, "voiced no concerns or complaints . . . ."  (*Id*., PageID.685.)

On December 21, 2017 and again on January 4, 2018, Plaintiff received supplies, including "one bar of soap."  (*Id*., PageID.687, 690.)  At his February 8, 2018 nurse's appointment, Plaintiff received some supplies, but the notes indicate that he was "very upset about not having the liquid soap for cleaning himself in his room since he cannot use the toilet, and has no sink in his cell, the bar of soap is no

11

help." The notes further indicate that "ACMO approval for liquid waterless soap was deferred." (*Id*., PageID.692.)

On February 15, 2018, Plaintiff had a chronic care visit, apparently with Physician Assistant Jindal, and the air mattress was replaced. (*Id*., PageID.693, 695.) On March 28, 2018, Jindal sought ACMO Review for non-formulary medications Ultram (Tramadol) and Baclofen to treat Plaintiff's right upper extremity. (*Id*., PageID.697-698.) The request was approved the same day, seemingly to be reviewed in one year. (*Id*., PageID.698.)

### c. May 2018 – December 2018 (ARF)

Plaintiff initiated the instant lawsuit in May 2018, while incarcerated at ARF. On May 17, 2018, Jindal saw Plaintiff for a chronic care visit, seemingly for his Type II diabetes mellitus. (*Id*., PageID.699-701.) He received briefs, gloves and blue pads on May 28, 2018. (*Id*., PageID.702.) On May 29, 2018, Jindal saw Plaintiff for a wound on his right hip/buttock, prescribed topical cream, and ordered daily wound care for one week. (*Id*., PageID.703-704.) Jindal checked the wound on June 2nd, 3rd, and 19th. (*Id*., PageID.705-707.) On August 14, 2018, Plaintiff had a chronic care visit, and Jindal noted that Plaintiff's dermatologic exam was positive for rash. (*Id*., PageID.708-712.) The medical evidence of record also includes a September 29, 2018 wound check with Jindal and a November 28, 2018 Chronic Care Visit with Jindal. (*Id*., PageID.713-717.)

12

On December 4, 2018, Jindal sought ACMO Review for a single-cell

accommodation, explaining, *inter alia*, that, under the Medical Services Advisory

Committee (MSAC) guidelines, "sanitation warrants single[-]cell

accommodation." (*Id.*, PageID.718.) ACMO Coleman approved the request

approximately 2 hours later. (*Id.*, PageID.719-720.)[2]

## 2. Deliberate indifference to a serious medical need

Each of Plaintiff's two causes of action is based on the Eighth Amendment –

one regarding a suitable air mattress and another regarding waterless foam soap

and a TENS unit. (ECF No. 28, ¶¶ 23-33.) Plaintiff contends that, "[b]y revoking

[his] special accommodation notices on the basis of financial considerations, the

defendants have demonstrated themselves to be deliberately indifferent to

Plaintiff's serious medical condition." (ECF No. 28, PageID.198 ¶ 6.)

"The Eighth Amendment's prohibition on cruel and unusual punishment

generally provides the basis to assert a § 1983 claim of deliberate indifference to

serious medical needs...." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th

Cir. 2008). "A constitutional claim for deliberate indifference to serious medical

needs requires a showing of objective and subjective components." *Phillips*, 534

---

[2] On or about December 21, 2018, Plaintiff was transferred to Earnest C. Brooks
Correctional Facility (LRF), but he apparently returned to ARF in February 2019.
(*Id.*, PageID.721-722; ECF No. 46; ECF No. 48.) ARF is his current address of
record.

F.3d at 539; *see also Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing

*Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)).  As the Supreme Court

has instructed in *Farmer v. Brennan*, 511 U.S. 825 (1994):

> It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. *First*, the deprivation alleged must be, objectively, "sufficiently serious," ...; a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities," .... For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. ...
>
> The *second* requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." ... To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." ... In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety, ... a standard the parties agree governs the claim in this case.

*Farmer*, 511 U.S. at 834 (emphases added, internal footnote and internal citations

omitted).  The Court then went on to set forth the test for deliberate indifference:

> ... a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and *disregards* an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.... But an official's failure to alleviate a significant risk that he *should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Id.* at 837–838 (emphasis added).  "[S]ubjective recklessness as used in . . .

criminal law is a familiar and workable standard that is consistent with the Cruel

and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the

test for 'deliberate indifference' under the Eighth Amendment."  *Id.* at 839–840.

### 3.      Count I (a suitable air mattress)

Plaintiff explains that his pressure ulcers (or bedsores) "are manageable if

[he] is provided with an air mattress suitable for pressure ulcer treatment[,]" such

as the "Med-Aire 8 Alternating Pressure Mattress Replacement System" with

which he was allegedly provided during his confinement.  (ECF No. 28, ¶¶ 14, 15.)

According to Plaintiff, the mattress became inoperable in 2016, and he was

provided with "a different mattress that was not designed or intended to prevent the

onset of bedsores[.]"  (*Id.*, ¶ 16.)  Almost immediately, he "developed bedsores and

filed several ADA complaints with the MDOC[.]"  (*Id.*, ¶ 17.)

As noted in the above medical history, on November 18, 2017, while

incarcerated at ARF, Plaintiff informed health care that he had just discovered a

bedsore at the base of his tailbone.  (ECF No. 72, PageID.659; ECF No. 28, ¶ 19.)

Plaintiff brings his mattress-related claim against Defendants Corizon and Jindal.

(ECF No. 28, ¶ 27.)  As Plaintiff puts it, they knew, given his "serious medical

condition" and "susceptibility to suffering from bedsores," that "an air mattress

suitable for medium and high-risk pressure ulcer treatment and designed to reduce

the incidence of pressure ulcers" was "medically-necessary." (*Id*., ¶ 25.)
Additionally, Plaintiff alleges that the refusal of a suitable mattress – which he
contends was "the direct cause of [his] bedsores . . . [,]" – as part of "a recently-
enacted policy and custom of scaling back medical assistive devices as a cost-
cutting device" is evidence of deliberate indifference to Plaintiff's serious medical
condition. (*Id*., ¶ 26.)

Considering the record before the Court, Defendants Corizon and Jindal are
entitled to summary judgment as to Plaintiff's claim that they were deliberately
indifferent to his serious medical need by failing to provide a specialized air
mattress. First, the March 31, 2014 order in question reads, "Medical
Equipment/Supplies: Other, Air Mat[t]ress." (ECF No. 74, PageID.746.) There is
no further description. As the nurse explained in June 2017, when Plaintiff
requested replacement of his specialized air mattress, "you have no approval for
any thing [sic] other than the standard state issue air mattress. If you require
something more, please discuss with your provider and have him/her obtain the
necessary approvals from ACMO." (ECF No. 72, PageID.609.) Second, it seems
that Plaintiff still has this special accommodation order. (*Id*.) In fact, Jindal did
not include the air mattress among the eleven "Off-guideline Medical Details and
Special Accom[m]odations" that she asked the ACMO to review on November 15,
2017. (ECF No. 72, PageID.657.) Third, in September 2017, there was an attempt

16

to repair the air mattress and a note that Plaintiff would be "given new one when available[,]" (*id.*, PageID.640); in October 2017, Plaintiff sought a patch kit and apparently stated he would file an "ADA complaint and grievance soon . . . [,]" and did not "want bed sores[,]" (*id.*, PageID.645); he appears to have been given an air mattress on October 11, 2017 (*id.*, PageID.646-647); on November 21, 2017, when the mattress material was stress fractured and not repairable, the mattress was replaced (ECF No. 72, PageID.662); and, it seems his air mattress was replaced on February 15, 2018 (*id.*, PageID.695). That Plaintiff's air mattress – even if only a non-specialized one – was replaced when it was not repairable does not support a claim of deliberate indifference. Fourth, albeit more applicable to a negligence or medical malpractice claim, the evidence does not support a conclusion that the bedsores of which Plaintiff now complains were caused by the alleged 2016 change from specialized to non-specialized air mattress. Plaintiff's 5-page MDOC "Wound Care Monitor" shows treatment as early as March 2, 2013 (on the right thigh), then on multiple occasions from March 2015 to August 2015 (many on the right buttock), and, finally, on August 10, 2017 (again, the right buttock). (ECF No. 72, PageID.613-618, 619-622.) Thus, even if the reasons for the various 2013-2017 visits are unclear, this report is at least evidence that Plaintiff required wound care within the five-year period – *i.e.*, 2011-2016 – that he claims to have had a specialized air mattress. (ECF No. 28, ¶ 16.) Likewise, the medical record is

replete with references to "wound care" in records post-dating those on the "Wound Care Monitor," such as notes dated August 28, 2017 through November 28, 2018. (*See*, *e.g.*, *id*., PageID.627, 660, 662-665, 670, 676, 680, 682-683, 704-707, 713, 717.) Therefore, considering that Plaintiff had wound treatment during the years he had his specialized air mattress *and* after the specialized air mattress was allegedly replaced with a non-specialized air mattress, it certainly seems that Plaintiff received treatment for his wounds when they occurred.

In his response, Plaintiff contends that his history of ulcers and wound treatment "does not absolve them of their constitutional responsibility to provide him with proper care for his bedsore condition that preexisted his transfer to ARF." (ECF No. 74, PageID.734.) Also, Plaintiff declares that the failure to provide him "with an air mattress that is designed to minimize pressure points on [his] body" increased the frequency of bedsores, "which were exacerbated by the fact of [his] fecal incontinence and inability to properly cleanse [him]self[.]" (ECF No. 74, PageID.738 ¶ 6 [Plaintiff's Decl.].) But, even assuming, *arguendo,* that bed sores meet the objective component of being "sufficiently serious," Plaintiff's cause of action based on a "suitable mattress" (ECF No. 28, ¶¶ 25-26) and his reference to "proper care" (ECF No. 74, PageID.734), in addition to the aforementioned and myriad records concerning air mattresses and wound treatment, highlight this claim as one based on negligence or medical malpractice, rather than the "sufficiently

culpable state of mind" required to satisfy the subjective component.  *Farmer*, 511 U.S. at 834.

In the end, the air mattress order appears to remain in place, Plaintiff has been provided an air mattress, he has received assistance when it is broken, the evidence that Jindal and Corizon Health's failure to provide him with a "suitable air mattress" was the "direct cause" of his bedsores (*see* ECF No. 1, ¶ 26) is problematic (even taking considering Plaintiff's declaration that not having a specialized air mattress resulted in "more frequent bouts of bedsores" (ECF No. 74, PageID.738 ¶ 6)), and he has received treatment for his wounds.  The parties are simply at odds about the medical necessity of or medical justification for a *different* air mattress.  (*Compare* ECF No. 28, PageID.201 ¶ 25, *with* ECF No. 71, PageID.583.)  As the Supreme Court has instructed, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle*, 429 U.S. at 106.  "Allegations 'that more should have been done by way of diagnosis and treatment' and 'suggest[ions]' *of other* 'options that were not pursued' raise at most a claim of medical malpractice, not a cognizable Eighth Amendment claim."  *Rhinehart v. Scutt*, 894 F.3d 721, 741 (6th Cir. 2018) (quoting *Estelle*, 429 U.S. at

19

107).  *See also Estelle*, 429 U.S. at 107 ("the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice[.]"); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").  Here, the provision of a non-specialized air mattress (instead of a specialized one) does not amount to medical attention that is "so woefully inadequate as to amount to no treatment at all."  *Westlake*, 537 F.2d at 860 n.5. Accordingly, Defendants Jindal and Corizon are entitled to summary judgment on Count I.

### 4.    Count II (waterless foam soap and TENS unit)

Plaintiff takes issue with the November 15, 2017 ACMO review, which resulted in the deferral of certain special accommodations, including the orders for a single-person room, a bottle of foam soap, and a TENS unit.  (ECF No. 28, ¶¶ 20-22; ECF No. 72, PageID.655-658.)  His second Eighth Amendment claim, which he brings against all three Defendants (Corizon, Coleman and Jindal), is based on the removal of two of these orders – *i.e.*, he alleges that the waterless

foam soap is required "as a basic sanitary measure[,]" and the TENS unit was "a medically-necessary device" to treat the pain in his hands.  (*Id*., ¶¶ 30-31, 33.) Although the single-person cell order is expressly mentioned within the operative pleading's statement of relevant facts (*id*., ¶ 21), it is not the subject of either cause of action.

As Plaintiff puts it, Defendants knew he was a paraplegic who "is physically unable to use the regular commodes and urinals . . . [,]" and "was relegated having to defecate inside of his assigned cell[.]"  (ECF No. 28, ¶ 29.)  Plaintiff claims that revocation of his special accommodation notices for waterless foam soap and a TENS unit – as part of a "recently-enacted policy and custom of scaling back medical assistive devices as a cost-cutting device," – is evidence of deliberate indifference to Plaintiff's serious medical condition.  (ECF No. 28, ¶ 32.)

### a.    TENS unit

It is clear that Jindal sought ACMO review for "Off-guideline Medical Details and Special Accom[m]odations" on November 15, 2017, including the order for a "TENS unit and supplies[.]"  (ECF No. 72, PageID.655.)  Coleman deferred this request, explaining that ". . . the MDOC does not allow TENS units any longer.  That needs to be retrieved from the patient today."  (*Id*., PageID.656.)

Plaintiff takes issue with Defendants' lack of support for the explanation that "the MDOC has banned TENS units[,]" and, even if it is true, Plaintiff asserts that

Defendants "failed to provide [him] with an alternative pain treatment for his hands[.]" (*Id.*, PageID.736.)  In fact, Plaintiff declares that, following the cancellation of his TENS unit in 2017 and the cancellation of his Ultram (Tramadol) prescription in 2019, he "ha[s] not been provided with any treatment for the pain in [his] hands[.]"  (ECF No. 74, PageID.739 ¶ 7 [Plaintiff's Decl.].)

The record belies Plaintiff's assertion.  Tramadol (Ultram®) is a pain reliever and Baclofen is a skeletal muscle relaxant.[3]  On March 29, 2017, the Pain Management Committee (PMC) approved one year of Tramadol.  (ECF No. 72, PageID.649, 693; *see also id.*, PageID.625.)[4]  Two days later, on March 31, 2017, the PMC approved one-year of Baclofen.  (ECF No. 72, PageID.623, 693.)  During that year, on November 16, 2017, the order for a TENS unit was removed.  On March 28, 2018, Jindal secured approval for non-formulary medications Ultram and Baclofen.  (ECF No. 72, PageID.697-698; ECF No. 71, PageID.579.)  Although Plaintiff's prescriptions for Baclofen and Tramadol seem to have expired on March 28, 2019 (ECF No. 72, PageID.721), this is a date well after the May

---

[3] *See* https://medlineplus.gov/druginfo/meds/a695011.html (Tramadol), https://medlineplus.gov/druginfo/meds/a682530.html (Baclofen).

[4] Plaintiff's August 2017 "Intrasy[s]tem Transfer Summary" lists Tramadol Hcl among Plaintiff's then-current active medications, explains that the ACMO approved it, and indicates a stop date of October 31, 2017.  (ECF No. 72, PageID.623.)  It is unclear to the Court whether this is a duplicative prescription or intended to be associated with the PMC's Tramadol prescription that was to conclude in March 2018.

2018 initiation of this case or, for that matter, the September 2018 first amended

complaint.  The upshot of this prescription timeline is that the dispute appears to

come down to a debate about what *form* of medical treatment to provide, not about

indifference or lack of treatment.

### b.      Foam soap

Plaintiff contends that he has never been provided with foam soap at ARF.

(ECF No. 74, PageID.733-734.)  This appears to be accurate.  On August 25, 2017,

when Plaintiff transferred from MRF to ARF, he had an active order for a monthly

bottle of foam soap.  (ECF No. 72, PageID.625.)  When he inquired about foam

soap on September 14, 2017, he was told it was "not in yet" but would be

"dispense[d] upon arrival[.]"  (*Id.*, PageID.638.)  At this point, perhaps ARF did

not have a supply to give.  Then, on September 28, 2017 (a date when the foam

soap order was seemingly still active), Plaintiff was allegedly told that foam soap

was not ordered, due to "no RMO approval."  (*Id.*, PageID.642-643.)  In fact, notes

from that nurse's visit, which was approximately two weeks *prior to* the November

15, 2017 ACMO review at issue in this lawsuit, state:  "Please review Special Acc.

and address issues including [f]oam soap."  (*Id.*)

To be clear, Plaintiff seems to be mistaken about when the order for foam

soap was cancelled.  He argues that his order for foam soap "had been canceled by

Defendant Jindal at least two months prior to the time she and Defendant Coleman

23

indicated in their respective affidavits[,]" (ECF No. 74, PageID.734), *i.e.*, in September 2017.  Still, whatever Plaintiff was told at the September 14th and September 28th nurse visits, the evidence shows that Plaintiff's order for a monthly bottle of foam soap was not canceled until mid-November.  Specifically, on November 15, 2017, the date of Jindal's request for ACMO review that included a monthly bottle of foam soap, such an order was still on his list of special accommodation orders.  (ECF No. 72, PageID.654.)  Although Jindal's 2:22 p.m. request explains that Plaintiff uses the foam soap for cleansing, Coleman's 4:56 p.m. response asks why "foam soap instead of regular soap" was necessary and further notes:  "[w]e have many paraplegics within the MDOC and I have never been asked to approve these."  (ECF No. 72, PageID.653, 655-656.)  It is not clear whether Jindal provided further information; however, even if she failed to do so, it would be evidence of neglect and not deliberate indifference, especially considering that she included a monthly bottle of foam soap in the initial November 15, 2017 ACMO review application.

By contrast, "decision maker" Coleman's 8:11 p.m. deferral of the "foam soap holder" was without explanation, and the foam soap order was removed from Plaintiff's list by November 16, 2017.  (*Id*., PageID.657-658; ECF No. 74,

PageID.746.)[5]  Thus, even if the foam soap was effectively cancelled in September 2017 but not officially cancelled until November 2017, there remains a genuine dispute as to a material fact –Coleman's *reason* for the deferral of foam soap, if any.

In their *motion*, Defendants contend it "was not medically justified as the Plaintiff had been using bar soap with no adverse consequences[.]"  (ECF No. 71, PageID.580, 583.)  This statement is troublesome for two reasons.  First, Plaintiff correctly points out that his foam soap order began on March 31, 2014, which is approximately 3 ½ years prior to his arrival at ARF.  (ECF No. 74, PageID.735.)  As best the Court can tell from Defendants' "relevant" medical record submission, Plaintiff first received bar soap on September 28, 2017 and, thereafter, on December 21, 2017, on January 4, 2018, and perhaps again on February 8, 2018.  (ECF No. 72, PageID.642, 687, 690, 692.)  Thus, it would seem that Plaintiff had only been using bar soap for approximately 1½ months prior to the November 15, 2017 ACMO review, and Defendants do not cite evidentiary support for their statement that there have been "no adverse consequences."  (ECF No. 71, PageID.580.)  Second, and perhaps more importantly, the reason for the deferral of

---

[5] Given Defendant Jindal's request for approval of "[f]oam soap *bottle* (1 btl/month)," the Court assumes that Defendant Coleman's deferral of a "foam soap *holder*" was a typographical error.  (*See* ECF No. 72, PageID.653, 655, 657 (emphases added).)

foam soap is unclear.  Neither Jindal's nor Coleman's affidavit enlightens the Court on this point.  (ECF No. 71-2 ¶¶ 4-5, ECF No. 71-3 ¶¶ 6, 8.)  Instead, these affidavits do little more than replicate the medical records.[6]

In response to Defendants' argument, Plaintiff argues that foam soap *is* medically justified; in fact, he creates a picture whereby it is not only merely *justified*, but, in light of his paraplegia and need to avoid infection through good hygiene, *necessary*.  He declares that he is "unable to use a conventional toilet" and "must defecate inside [his] assigned cell while lying on [his] bed and manually stimulate [his] anus as part of the process of fecal elimination[.]"  (ECF No. 74, PageID.738 ¶ 4 [Plaintiff's Decl.].)  In his response, he contends that:  (1) at the time of his first encounter with Defendant Jindal (*i.e.*, August 28, 2017), she knew about his need to "digitally stimulate bowel movements," his inability "to transfer to commode/toilet to have bowel movements, due to upper extremity weakness, and [that he] does so on his bed[,]" and that he was "[o]ften incontinent of feces[,]" (ECF No. 72, PageID.718-719 [Dec. 4, 2018 ACMO Review]); and, (2) Jindal knew he had "no sink in his cell . . . [,]" (ECF No. 72, PageID.692 [Feb. 8, 2018 Nurse Visit]).  (ECF No. 74, PageID.735.)  Therefore, in Plaintiff's opinion, "no

---

[6] Specifically, Defendants Jindal and Coleman review the medical records and each attest in a subjective, conclusory manner:  "I do not believe that I, in any way, acted with deliberate indifference in Mr. Woollard's case, as I treated him in a manner that I, in my medical judgment, feel was appropriate."  (ECF No. 71-2, ¶ 18; ECF No. 71-3, ¶ 11.)

reasonable factfinder could find that Defendants' cancellation of Plaintiff's Special Accommodation Notice for foam soap was medically justified." (*Id.*)

Setting aside the absolute nature of Plaintiff's conclusion, at the very least, Plaintiff has provided "evidence upon which a reasonable jury could return a verdict in favor of the non-moving party . . . ." *Lee*, 432 F. App'x 435, 441 (6th Cir. 2011) (citing *Henderson v. Walled Lake Consol. Schs,* 469 F.3d 479, 487 (6th Cir.2006)). The Undersigned certainly appreciates the logic of an individual in Plaintiff's position needing waterless foam soap. One need only look at Plaintiff's declaration that, when his order for waterless foam soap was cancelled, he "was left without any means of cleansing [him]self after defecating, as [his] assigned cell d[id] not have a sink, toilet, or running water[.]" (ECF No. 74, PageID.738 ¶ 5 [Plaintiff's Decl.].) While Plaintiff may have had different cell assignments during his incarceration at ARF, it seems that in February 2018 – a date after the removal of the foam soap order – he was assigned to a cell without a sink. (ECF No. 72, PageID.692.) Without evidence of Coleman's explanation for deferring the request to approve a monthly bottle of foam soap, and considering that Plaintiff is a paraplegic who "[h]as to digitally stimulate bowel movements, and [is] unable to transfer to commode/toilet to have bowel movements," (ECF No. 72, PageID.718-719), it is entirely possible a reasonable jury could conclude that giving Plaintiff bar soap in September 2017, December 2017 and January 2018 amounted to no

soap at all, especially considering that Plaintiff seems to have told the nurse in February 2018 that "he cannot use the toilet, . . . has no sink in his cell, [and] the bar of soap is no help." (ECF No. 72, PageID.642, 687, 690, 692). Given the basic nature of thorough hygiene, some jurors may even be appalled by this scenario. In sum, this is more than evidence of a dispute over treatment; rather, it is at least indicative of a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. Accordingly, the portion of Count II related to the order for foam soap should proceed as to Defendant Coleman only (*i.e.*, not as to Defendant Jindal or Defendant Corizon Health, the latter of which is discussed further below).

### c.    Single-cell accommodation

Finally, a note about Plaintiff's single-cell accommodation is in order. As noted above, although Plaintiff mentions this order in his operative pleading (ECF No. 28, ¶ 21), it is not the basis for either of his Eighth Amendment claims. This interpretation is buttressed by his response, which describes his complaint as based on the three matters – *i.e.*, the failure to provide him with a "medically-necessary air mattress," waterless foam soap, and a TENS unit – addressed above. (ECF No. 74, PageID.729.) Still, in his *response*, Plaintiff contends that "[a] reasonable factfinder could easily conclude that Defendants' cancellation of Plaintiff's Special Accommodation Notice for a single-person room," which would "forc[e] him to defecate on his bed in the presence of another prisoner," was "medically

28

unjustifiable," "cruel and inhumane," and "carried 'a substantial risk of serious harm' to Plaintiff."  (*Id*., PageID.735-736.)

Even though the single-cell accommodation is not at issue in Plaintiff's causes of action, to the extent it has an effect upon Plaintiff's concern about defecating in front of others, the November 2017 ACMO Review at least provided an explanation:  "Per MDOC guidelines, he does not qualify for a single-person room.  He is to have a wheelchair accessible room which negates the need for a single-person room."  (*Id*., PageID.656.)  Then, approximately one year thereafter, as we now know, on December 4, 2018, Jindal sought ACMO Review for a single-cell accommodation – explaining, *inter alia*, that, under the Medical Services Advisory Committee (MSAC) guidelines, "sanitation warrants single[-]cell accommodation" – which Coleman approved.  (ECF No. 72, PageID.718-720; ECF No. 71, PageID.579.)

### d.   **Summation**

Plaintiff contends that "[t]he absence of a 'Stop Date' for any of these accommodations indicates that they were intended to be permanent."  (ECF No. 74, PageID.730.)  Given that "[a] current Medical Detail or Special Accommodation Notice shall be valid at all facilities unless cancelled in accordance with Paragraphs K through N of this policy[,]" MDOC PD 04.06.160 ¶ O, Plaintiff asserts that Defendants do not provide any explanation in their motion

"for why Plaintiff's valid Special Accommodations Notice issued at the previous facility was not honored at ARF[,]" and he questions why his single-cell special accommodation order needed to be reviewed on August 28, 2017.  (ECF No. 74, PageID.732; *see also* ECF No. 72, PageID.628.)

Yet, the evidence does not suggest that formal review of Plaintiff's special accommodation notices took place in August 2017.  Setting aside multiple considerations (*e.g.*, the apparent reasonableness of evaluating or re-evaluating a cell-type accommodation upon transfer to a new facility, whatever Jindal's August 28, 2017 statements revealed about her intentions, Plaintiff's September 3, 2017 kite mentioning his accommodations, and what he was allegedly told about foam soap at his September 2017 nurse visits), it remains that the accommodations in question – air mattress, foam soap, and TENS unit – were active on the afternoon of November 15, 2017 but removed by the morning of November 16, 2017. (*Compare* ECF No. 72, PageID.654, *with* ECF No. 74, PageID.746.)  Put another way, it does not appear that the subject orders were canceled "between August 25, 2017 and when Defendant Jindal submitted the alleged ACMO request on November 15, 2017."  (ECF No. 74, PageID.733.)  Thus, Plaintiff's challenge to Jindal's attestation that she "sent in an ACMO request" on November 15, 2017 (ECF No. 71-2) is not convincing.

Moreover, on the substantive front, Plaintiff cites the direction that a medical practitioner shall cancel the order if he/she "believes there is no current medical need for the Medical Detail or Special Accommodation Notice," MDOC PD 04.06.160 ¶ M, and posits that Defendants have not presented the Court with any evidence "proving that Plaintiff's medical condition improved to a point that justified the cancellation of any of his Special Accommodations Notices." (ECF No. 74, PageID.732.) Yet, this argument misses the mark of an Eighth Amendment claim.

Here, as with Count I, the deferral of the TENS unit order (which is one portion of Count II), and even the single-cell order that is not a basis for Plaintiff's cause of action, are matters of medical judgment, not medical attention "so woefully inadequate as to amount to no treatment at all." *Westlake*, 537 F.2d at 860 n.5. In the record before the Court, there is no evidence that either Jindal or Coleman (or for that matter Corizon Health) were deliberately indifferent to Plaintiff's serious medical need when applying for approval of or deferring the order for a TENS unit in November 2017. Thus, Defendants Corizon, Coleman, and Jindal are entitled to summary judgment as to Plaintiff's claim that they were deliberately indifferent to his serious medical need by "revoking" the TENS unit order. However, as noted above, there remains a genuine dispute as to a material fact –Coleman's reason for the deferral of foam soap. Accordingly, the portion of

31

Count II related to the order for foam soap should proceed as to Defendant

Coleman, although not as to Jindal, and – as explained below – not as to Corizon

Health.

### 5.      Alleged recently-enacted, cost-cutting policy and custom

Finally, to the extent Plaintiff brings claims against Corizon Health as the

MDOC's health care provider, it is well-settled that a corporation like Corizon or

an agent sued in his official capacity cannot be held liable under § 1983 under the

theory of *respondeat superior* or vicarious liability.  *See Monell v. Dep't of Soc.*

*Servs.*, 436 U.S. 658, 694 (1978); *Street v. Corrections Corp. of Am.*, 102 F.3d 810,

817-18 (6th Cir. 1996) (*Monell's* bar to *respondeat superior* liability applies to

private corporations such as Corizon that are performing services as an agent of the

State and are therefore deemed to be state actors for purposes of § 1983).  Rather,

to state a claim of deliberate indifference against Corizon or individual defendants

in their official capacities, Plaintiff must plead a claim of a <u>specific</u> policy,

practice, or custom of that "directly caused [him to suffer] a deprivation of federal

rights."  *Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001)

(quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 415 (1997)); *see*

*also Hodges v. Corizon,* No. 14-11837, 2015 WL 1511153, at *4 (E.D. Mich. Mar.

30, 2015) ("[T]o state a § 1983 '*Monell*' claim against Corizon, [Plaintiff] must

identify a *specific* policy of Corizon's that 'directly caused [him to suffer] a

32

deprivation of federal rights.' ") (emphasis added); *Jane v. Patterson*, No. 1:16 CV 2195, 2017 WL 1345242, at *6 (N.D. Ohio Apr. 12, 2017) ("For Plaintiff to present a viable *Monell* claim, he must identify a *specific* policy or custom that was the moving force behind Plaintiff's alleged constitutional violation.") (emphasis added, citations omitted). "An allegation, stated in a conclusory manner, that a governmental entity had a policy which caused an injury is insufficient where a specific policy or custom is not identified." *Jane*, 2017 WL 1345242, at *6 (finding that "[a] conclusory allegation that the City had a policy of deliberate indifference to the criminal conduct by its agents is insufficient to state a *Monell* claim").

To the extent Plaintiff alleges within his verified complaint that there is a "recently-enacted policy and custom of scaling back medical assistive devices as a cost-cutting device," (ECF No. 28, ¶¶ 26, 32), Defendants rightfully note that the alleged existence of such a policy and custom is "conclusory." (ECF No. 71, PageID.582.) "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). More importantly for purposes of this motion for summary judgment, Plaintiff has not *shown by proffering evidence* that there was an unconstitutional cost-cutting "policy, practice, or custom," let alone that Coleman's or Jindal's decisions – whether

related to a specialized air mattress or foam soap or a TENS unit – were the result of such a Corizon Health policy.  (ECF No. 71, PageID.582-583.)  Even if Plaintiff were relying upon his declaration that, on several occasions, nurses told him he "would no longer be provided with these items [*i.e.*, waterless foam soap, a proper air mattress and TENS unit supplies] because they are 'too costly[,]'" (ECF No. 74, PageID.738 ¶ 3 [Plaintiff's Decl.]), this is a non-specific assertion.  Moreover, it unclear whether these nurses were employees of non-party MDOC or Defendant Corizon Health, and, even if they were employees of Defendant Corizon Health, the Court would want to hear from the alleged *declarants* themselves if Plaintiff were to offer any such statements "to prove the truth of the matter asserted in the statement[,]" and to bind the declarant's employer.  *See generally* Fed. Rules Evid. 801-807.  Hearsay will not suffice.

### E.    Conclusion

Plaintiff contends that Defendants "failed to prove that the failure to provide [him] with a proper air mattress and the cancellation of his special accommodations was medically justified."  (ECF No. 74, PageID.726, 729, 736.) He also declares that his overall health "has not improved to the point that the cancellation of [his] Special Accommodations was medically justified[.]"  (*Id.*, PageID.739 ¶ 8 [Plaintiff's Decl.].)  Yet, Plaintiff's characterization of Defendants' actions as "an *improper* response to Plaintiff's needs[,]" (ECF No. 74, PageID.736)

34

(emphasis added), tends to confirm that his claims are based on negligence or medical malpractice, rather than *deliberate indifference*.

In fact, the extensive record here indicates that – with the exception of the foam soap order – this was an interactive process, in which Plaintiff and the health care providers went back and forth about his needs and the best way to accommodate or treat them. Although Plaintiff may disagree with the ultimate conclusions and decisions reached by his health care providers and the manner in which they chose to address his needs, this does not amount to constitutionally prohibited "deliberate indifference," except as to the foam soap order for which a genuine dispute remains. Accordingly, as set forth in detail above: Defendants Jindal and Corizon Health are entitled to summary judgment on Count I, which concerns a suitable air mattress (Section D.3); Defendants Corizon Health, Coleman and Jindal are entitled to summary judgment on the portion of Count II related to the TENS unit (Section D.4.a); and, Plaintiff should be permitted to proceed with the portion of Count II related to the foam soap order as to Defendant Coleman, because there remain related genuinely disputed issues of material (Section D.4.b), although not as to Defendant Jindal (*id*.) or Defendant Corizon Health (Section D.5).

### III.   PROCEDURE ON OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.* If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: January 7, 2021

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE